**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| **GIGAMON INC.,**<br><br>    **Plaintiff,**<br><br>v.<br><br>**APCON, INC.,**<br><br>    **Defendant.** | **Civil Action No. 2:19-cv-300**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Gigamon Inc. ("Gigamon" or "Plaintiff") for its Complaint against defendant Apcon, Inc. ("Apcon" or "Defendant"), alleges as follows:

### NATURE OF THE ACTION

1. This is a civil action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*

2. This action arises out of Apcon's infringement of United States Patent Nos. 8,570,862 (attached as Exhibit A); 8,824,466 (attached as Exhibit B); 8,830,819 (attached as Exhibit C); 8,873,557 (attached as Exhibit D); 9,077,656 (attached as Exhibit E); and 9,769,049 (attached as Exhibit F) (collectively, the "Patents-in-Suit").

### PARTIES

3. Gigamon is a Delaware corporation with its principal place of business at 3300 Olcott St., Santa Clara, California 95054. Gigamon is a computer network visibility company that researches, designs, develops, and manufactures products and solutions for improving network operability, security, and performance. Gigamon was founded in 2004 and currently has over 850

employees. Gigamon has been an innovator in network visibility for over 15 years. Gigamon employees developed the technology underlying the Patents-in-Suit.

4. Defendant Apcon is an Oregon corporation having a principal place of business at 9255 SW Pioneer Ct., Wilsonville, Oregon 97070. Defendant also owns and operates a Regional Center located at 4351 Mapleshade Creek, Plano, Texas 75093. Apcon's Registered Agent for service of process in Texas is Scott Kuehns, located at 2708 Aspen, McKinney, Texas 75070.

## JURISDICTION

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, including 35 U.S.C. § 271 *et seq*.

6. This Court has personal jurisdiction over Apcon because, among other things, Apcon has committed and continues to commit acts of infringement in violation of 35 U.S.C. § 271 by placing infringing products into the stream of commerce, with the knowledge and understanding that such products are sold in the State of Texas, including in the Eastern District of Texas (this "District").

7. For example, Apcon has made, used, sold, and/or placed infringing products and services (e.g., IntellaFlex XR) into the stream of commerce with the reasonable knowledge, expectation, and understanding that such products and services are used and sold in this District. Those acts have caused and continue to cause injury to Gigamon within the District.

8. This Court also has personal jurisdiction over Apcon because Apcon has a regular and established place of business in this District. In particular, Apcon operates a Regional Center at 4351 Mapleshade Creek, Plano, Texas, which is within this District. Apcon conducts at least the following activities at its Plano, Texas location: product software development, product

engineering, and product testing; user experience and interface design; web development and graphic design; national and regional product sales; and product marketing.

9.      In addition, Apcon has used, sold, advertised, marketed, and distributed products and services in this District that practice the claimed inventions of the Patents-in-Suit.  Apcon derives substantial revenue from the sale of infringing services within the District, and expects or should reasonably expect its actions to have consequences within the District, and derives substantial revenue from interstate and international commerce.

10.     Apcon has therefore availed itself of the benefits and privileges of conducting business in the State of Texas, and the exercise of jurisdiction over Apcon would not offend traditional notions of fair play and substantial justice.

## VENUE

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b), because Apcon transacts business within this District and offers for sale in this District products that infringe the Patents-in-Suit.  In addition, venue is proper because Gigamon has suffered harm in this District as a result of Apcon's infringement.

## THE PATENTS-IN-SUIT

12.     U.S. Patent No. 8,570,862 ("the '862 patent"), titled "Mapping A Port On A Packet Switch Appliance," issued on October 29, 2013.  The named inventors of the '862 patent are Patrick Pak Tak Leong, King L. Won, and Ted Ho.  The '862 patent issued from Patent Application No. 12/876,128, filed on September 4, 2010.  *See* Exhibit A.

13.     Plaintiff Gigamon owns by assignment the entire right, title, and interest in and to the '862 patent, and holds the right to sue and recover damages for infringement thereof, including for past infringement.

14. U.S. Patent No. 8,824,466 ("the '466 patent"), titled "Creating And/Or Mapping Meta-Data For Data Storage Devices Using A Packet Switch Appliance," issued on September 2, 2014. The named inventors of the '466 patent are King L. Won and Patrick Pak Tak Leong. The '466 patent issued from Patent Application No. 12/869,621, filed on August 26, 2010. *See* Exhibit B.

15. Plaintiff Gigamon owns by assignment the entire right, title, and interest in and to the '466 patent, and holds the right to sue and recover damages for infringement thereof, including for past infringement.

16. U.S. Patent No. 8,830,819 ("the '819 patent"), titled "Network Switch With By-Pass Tap," issued on September 9, 2014. The named inventors of the '819 patent are Patrick Pak Tak Leong and Thomas Kwok Yin Cheung. The '819 patent issued from Patent Application No. 12/714,203, filed on February 26, 2010. *See* Exhibit C.

17. Plaintiff Gigamon owns by assignment the entire right, title, and interest in and to the '819 patent, and holds the right to sue and recover damages for infringement thereof, including for past infringement.

18. U.S. Patent No. 8,873,557 ("the '557 patent"), titled "Systems And Methods For Packet De-Duplication," issued on October 28, 2014. The named inventors of the '557 patent are Hung Nguyen, Sandeep Dahiya, and Murali Bommana. The '557 patent issued from Patent Application No. 13/083,410, filed on April 8, 2011. *See* Exhibit D.

19. Plaintiff Gigamon owns by assignment the entire right, title, and interest in and to the '557 patent, and holds the right to sue and recover damages for infringement thereof, including for past infringement.

20.     U.S. Patent No. 9,077,656 ("the '656 patent"), titled "Packet Switch Methods And Systems," issued on July 7, 2015.  The named inventors of the '656 patent are Tom Gallatin, Denny K. Miu, King L. Won, Patrick Pak Tak Leong, and Ted Ho.  The '656 patent issued from Patent Application No. 13/765,614, filed on February 12, 2013.  *See* Exhibit E.

21.     Plaintiff Gigamon owns by assignment the entire right, title, and interest in and to the '656 patent, and holds the right to sue and recover damages for infringement thereof, including for past infringement.

22.     U.S. Patent No. 9,769,049 ("the '049 patent"), titled "Monitoring Virtualized Network," issued on September 19, 2017.  The named inventor of the '049 patent is Hung Nguyen.  The '049 patent issued from Patent Application No. 13/560,968, filed on July 27, 2012.  *See* Exhibit F.

23.     Plaintiff Gigamon owns by assignment the entire right, title, and interest in and to the '049 patent, and holds the right to sue and recover damages for infringement thereof, including for past infringement.

## **FACTUAL BACKGROUND**

### A.  Gigamon's Innovations

24.     Since its founding in 2004, Gigamon has been researching, designing, developing, and manufacturing network visibility equipment and processes that have and are being used in a variety of enterprise, service provider, and government networks.  Gigamon has been the largest network visibility company in terms of market share in the United States for the past 6 years.  *See* https://www.gigamon.com/company/news-and-events/newsroom/ihs-markit-leader-2019.html.  Gigamon's customers include 10 top government agencies, over 80 Fortune 100 customers, and over 3,400 total customers worldwide.

25.     Gigamon's products include GigaVUE Visibility Appliances and virtual nodes, GigaStream traffic distribution, physical bypasses, GigaSMART network traffic intelligence applications, and GigaVUE-Fabric Manager.

26.     Gigamon's products permit its customers to obtain comprehensive visibility of their network data with reliable access to data from physical, virtual, and cloud networks.  Gigamon's products also help its customers use network data to improve the efficiency and security of customer networks by selectively tracking various types of data traffic on the network and providing the data for analysis to network managers as well as other third-party solutions.

27.     Gigamon's products and services provide cost and operational benefits and advantages over its competitors' architectures and solutions.  In particular, Gigamon's customers experience up to a 30-50% reduction in network downtime, a 50% increase in network security tool and resource efficiency, a 40-50% reduction in hardware and software server costs associated with network and security tools, and a 75% increase in visibility of network data depending on the deployment and usage of the equipment.

28.     The United States Patent and Trademark Office has awarded Gigamon 75 patents for innovations pertaining to network visibility.

**B.  Apcon's Infringing Products**

29.     Apcon competes with Gigamon in the network visibility industry.

30.     Apcon sells network monitoring products and solutions under several marketing names.  Apcon's infringing products (the "Accused Products") include:

- Apcon's Series 4000 Platform, including but not limited to Apcon's Series 4000 blade devices and software;

- Apcon's IntellaFlex XR suite of integrated products, including but not limited to Apcon's IntellaFlex XR blade devices, chassis, TAPs, WebXR software, and other software;

- Apcon's HyperEngine Packet Processor and software;

- Apcon's IntellaView Management Interface;

- Apcon's IntellaStore Platform, including but not limited to Apcon's IntellaStore II and IntellaStore II blades;

- Apcon's IntellaCloud solution; and

- Apcon's IntellaTap-VM solution.

31.     Apcon makes, uses, offers to sell, and/or sells in the United States, and/or imports into the United States, without the authorization of Gigamon, at least the Accused Products.

32.     Apcon's infringing products, such as the Accused Products, compete with Gigamon's products and there are no acceptable non-infringing alternatives.  As a result of Apcon's past and continued infringement, Gigamon has suffered and will continue to suffer lost sales and profits that it could have and would have made but for Apcon's infringement, and Gigamon has suffered and will continue to suffer marginal losses on transactions where Apcon's infringing sales resulted in depressed prices for Gigamon's products.

## COUNT I

### (Apcon's Infringement of the '862 Patent)

33.     Gigamon re-alleges and incorporates by reference the allegations in paragraphs 1-32 above.

34.     The '862 patent is valid and enforceable.

35. The '862 patent is generally directed to "[a] packet switch appliance" that "includes a plurality of ports." ('862 patent, Abs.) A "port map" is created that includes "a first map rule, which has a first criterion and a first action," and a "second map rule, which has a second criterion and a second action." (*Id*.) The patent describes various embodiments of the packet switch appliance and port mapping functionality.

36. Apcon has infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '862 patent under 35 U.S.C. § 271(a). Specifically, and without limitation, Apcon has directly infringed at least claim 1 of the '862 patent, in violation of 35 U.S.C. § 271(a), by making, using, selling, offering to sell, and/or importing in or into the United States without authority the Accused Products that meet the limitations of the '862 patent claims. These include at least Apcon's packet switch device systems with the capability of processing data packets using different rules and criteria, including but not limited to Apcon's IntellaFlex XR devices and systems.

37. As one non-limiting example, the Accused Devices directly infringe claim 1 of the '862 patent at least because the Accused Devices are packet switch devices (e.g., devices with IntellaFlex XR software) that provide visibility of network traffic, comprising: a processing unit (e.g., IntellaFlex 3000-XR); a first network port communicatively coupled to the processing unit and configured to communicate with the network (e.g., devices for port mirroring coupled to IntellaFlex 3000-XR); instrument ports communicatively coupled to the processing unit and configured to communicate with a respective network monitoring instrument (e.g., IntellaFlex 3000-XR ports coupled to tools); wherein the processing unit (e.g., with Apcon's IntellaFlex XR software installed) is configured to process packets received at a first network port using first and second rules and criterions (e.g., Apcon's IntellaFlex XR software enables multi-stage filtering

where a first and second filter are applied to the same incoming data stream); and each of the first and second criterion specifies a first packet value, wherein the first packet value specified by the first criterion is compared with a value of a portion of the packet, and wherein the processing unit drops or forwards the packet based at least in part on the comparison's result (e.g., Apcon's Multistage Filtering, or "MSF," provides configurable filter programming based on Boolean logic where packets are mapped directly to a destination or discarded, and Apcon's software comprises a filter creation function).

38. Apcon has also indirectly infringed at least claim 1 of the '862 patent, in violation of 35 U.S.C. § 271(b), by, for example, inducing infringement by third parties—including Apcon's customers—who have used, sold, offered to sell, and/or imported into the United States the Accused Products. Apcon knows or should know that its actions will induce infringement, it specifically intends to induce infringement, and it has knowledge that the induced acts constitute patent infringement.

39. Apcon also contributes to the infringement of (and thereby infringes) at least claim 1 of the '862 patent, in violation of 35 U.S.C. § 271(c), by, among other things, using, selling, and/or offering to sell in the United States, and/or importing into the United States, the Accused Products. Apcon knows or should know that the Accused Products, and/or hardware and software components thereof, are especially made or adapted for use in infringing the asserted claims of the Patents-in-Suit and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

40. The facts demonstrating Apcon's indirect infringement are largely the same whether under § 271(b) or § 271(c). At a minimum, Apcon will have knowledge of all the Patents-in-Suit, Apcon's infringement of the Patents-in-Suit, and infringement of the Patents-in-Suit by

the Accused Products, upon service of this Complaint. Apcon sells the Accused Products to customers in the United States through various retailers or direct to customers, many of the same customers to whom Gigamon markets and sells its products. Apcon encourages, trains, instructs, and provides support and technical assistance to its direct and indirect customers, potential customers, and end users to make infringing use of the Accused Products, such as by publishing and providing technical materials and promotional literature describing and instructing in the infringing use of the Accused Products. Apcon also actively induces others—e.g., customers, consumers, and Apcon's own employees in the United States—to infringe the Patents-in-Suit by encouraging and facilitating others to perform actions known by Apcon to infringe, including but not limited to the use of the Accused Products.

41.     Gigamon has been and continues to be damaged by Apcon's infringement of the '862 patent.

42.     Apcon's infringement of the '862 patent is exceptional within the meaning of 35 U.S.C. § 285.

## COUNT II

### (Apcon's Infringement of the '466 Patent)

43.     Gigamon re-alleges and incorporates by reference the allegations in paragraphs 1-42 above.

44.     The '466 patent is valid and enforceable.

45.     The '466 patent is generally directed to creating "meta-data tag[s]" for one or more "packets." ('466 patent, Abs.) The '466 patent describes various embodiments of the meta-data tag creation and use.

46.     Apcon has infringed, and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '466 patent under 35 U.S.C. § 271(a). Specifically, and

without limitation, Apcon has directly infringed at least claim 22 of the '466 patent, in violation of 35 U.S.C. § 271(a), by making, using, selling, offering to sell, and/or importing in or into the United States without authority the Accused Products that meet the limitations of the '466 patent claims. These include at least Apcon's packet switch device systems and methods with the capability of generating meta-data tags for data packets and routing of those tags, including but not limited to Apcon's IntellaStore II and its related software.

47. As one non-limiting example, the Accused Devices directly infringe claim 22 of the '466 patent at least because the Accused Devices are packet switch appliances (e.g., devices with IntellaFlex XR software), comprising: a first network port for receiving a first packet (e.g., devices for port mirroring coupled to IntellaFlex 3000-XR); a first instrument port for communication with a first device (e.g., IntellaFlex 3000-XR ports coupled to tools); a processing unit configured to create a first packet's first meta-data tag to pass the first meta-data tag to the first instrument port for transmission to the first device, wherein the first meta-data tag comprises one or both of an identifier of the packet switch appliance, and information about the first network port at which the first packet is received by the packet switch appliance (e.g., Apcon's related software for IntellaStore II inserts a "Port Tag" at the ingress); and a port for communication with an additional packet switch appliance (e.g., Apcon's hardware mounts in a chassis and shares a common management backplane such that there is no limit to passing data between blades).

48. Apcon has also indirectly infringed at least claim 22 of the '466 patent, in violation of 35 U.S.C. § 271(b), by, for example, inducing infringement by third parties—including Apcon's customers—who have used, sold, offered to sell, and/or imported into the United States the Accused Products. Apcon knows or should know that its actions will induce infringement, it

specifically intends to induce infringement, and it has knowledge that the induced acts constitute patent infringement.

49.     Apcon also contributes to the infringement of (and thereby infringes) at least claim 22 of the '466 patent, in violation of 35 U.S.C. § 271(c), by, among other things, using, selling, and/or offering to sell in the United States, and/or importing into the United States, the Accused Products. Apcon knows or should know that the Accused Products, and/or hardware and software components thereof, are especially made or adapted for use in infringing the asserted claims of the Patents-in-Suit and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

50.     The facts demonstrating Apcon's indirect infringement are largely the same whether under § 271(b) or § 271(c). At a minimum, Apcon will have knowledge of all the Patents-in-Suit, Apcon's infringement of the Patents-in-Suit, and infringement of the Patents-in-Suit by the Accused Products, upon service of this Complaint. Apcon sells the Accused Products to customers in the United States through various retailers or direct to customers. Apcon encourages, trains, instructs, and provides support and technical assistance to its direct and indirect customers, potential customers, and end users to make infringing use of the Accused Products, such as by publishing and providing technical materials and promotional literature describing and instructing in the infringing use of the Accused Products. Apcon also actively induces others—e.g., customers, consumers, and Apcon's own employees in the United States—to infringe the Patents-in-Suit by encouraging and facilitating others to perform actions known by Apcon to infringe, including but not limited to the use of the Accused Products.

51.     Gigamon has been and continues to be damaged by Apcon's infringement of the '466 patent.

52.     Apcon's infringement of the '466 patent is exceptional within the meaning of 35 U.S.C. § 285.

**COUNT III**

**(Apcon's Infringement of the '819 Patent)**

53.     Gigamon re-alleges and incorporates by reference the allegations in paragraphs 1-52 above.

54.     The '819 patent is valid and enforceable.

55.     The '819 patent is generally directed to "[a] network switch" with first and second "network port[s]" and "inline port[s]" and a "by-pass device" that operates in "a first mode of operation" and a "second mode of operation" upon occurrence of different conditions.  ('819 patent, Abs.)

56.     Apcon has infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '819 patent under 35 U.S.C. § 271(a).  Specifically, and without limitation, Apcon has directly infringed at least claim 1 of the '819 patent, in violation of 35 U.S.C. § 271(a), by making, using, selling, offering to sell, and/or importing in or into the United States without authority the Accused Products that meet the limitations of the '819 patent claims. These include at least Apcon's network switch apparatuses comprising a by-pass device capable of switching amongst various modes of operation upon the occurrence of an event, including but not limited to Apcon's IntellaFlex XR rack unit with IntellaFlex Bypass Switch.

57.     As one non-limiting example, the Accused Devices directly infringe claim 1 of the '819 patent at least because the Accused Devices are network switch apparatuses (e.g., devices with IntellaFlex XR software), comprising: a housing, wherein the network switch apparatus is a single device, and wherein the housing, a first network port, a second network port, a first inline port, a second inline port (wherein the first and second inline ports are for communication with a

pass-through device), a packet switch, and a by-pass device are parts of a single device (e.g., an IntellaFlex rack unit with IntellaFlex Bypass Switch); the by-pass device is configured to operate in a first mode of operation to pass a first packet received at the first network port to the packet switch (e.g., Apcon's Bypass TAP and Bypass Switch Blade operating in normal mode); the by-pass device is also configured to switch from the first to second operational modes upon a condition's occurrence, and wherein in the second mode of operation, the by-pass device transmits a second packet received at the first network port to the second network port without passing the second packet to the packet switch (e.g., Apcon's Bypass TAP and Bypass Switch Blade operating in Bypass mode when a network tool fails); wherein the network switch apparatus further comprises a logic device for detecting the second operation mode's triggering condition, and the logic device comprises a register (with CPU periodically writing to the register), and the logic device closes a mechanical relay to connect the first and second network ports when the logic device determines nothing is written to the register for a prescribed period (e.g., Apcon's Bypass TAP and Bypass Switch Blade switch to the second mode of operation automatically after a predetermined time; a register in the CPU would necessarily be used in detecting the absence or receipt of packets; and switching the device during power loss necessarily implies a mechanical default).

58.    Apcon has also indirectly infringed at least claim 1 of the '819 patent, in violation of 35 U.S.C. § 271(b), by, for example, inducing infringement by third parties—including Apcon's customers—who have used, sold, offered to sell, and/or imported into the United States the Accused Products. Apcon knows or should know that its actions will induce infringement, it specifically intends to induce infringement, and it has knowledge that the induced acts constitute patent infringement.

59.     Apcon also contributes to the infringement of (and thereby infringes) at least claim 1 of the '819 patent, in violation of 35 U.S.C. § 271(c), by, among other things, using, selling, and/or offering to sell in the United States, and/or importing into the United States, the Accused Products.  Apcon knows or should know that the Accused Products, and/or hardware and software components thereof, are especially made or adapted for use in infringing the asserted claims of the Patents-in-Suit and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

60.     The facts demonstrating Apcon's indirect infringement are largely the same whether under § 271(b) or § 271(c).  At a minimum, Apcon will have knowledge of all the Patents-in-Suit, Apcon's infringement of the Patents-in-Suit, and infringement of the Patents-in-Suit by the Accused Products, upon service of this Complaint.  Apcon sells the Accused Products to customers in the United States through various retailers or direct to customers.  Apcon encourages, trains, instructs, and provides support and technical assistance to its direct and indirect customers, potential customers, and end users to make infringing use of the Accused Products, such as by publishing and providing technical materials and promotional literature describing and instructing in the infringing use of the Accused Products.  Apcon also actively induces others—e.g., customers, consumers, and Apcon's own employees in the United States—to infringe the Patents-in-Suit by encouraging and facilitating others to perform actions known by Apcon to infringe, including but not limited to the use of the Accused Products.

61.     Gigamon has been and continues to be damaged by Apcon's infringement of the '819 patent.

62.     Apcon's infringement of the '819 patent is exceptional within the meaning of 35 U.S.C. § 285.

<u>**COUNT IV**</u>

**(Apcon's Infringement of the '557 Patent)**

63.     Gigamon re-alleges and incorporates by reference the allegations in paragraphs 1-62 above.

64.     The '557 patent is valid and enforceable.

65.     The '557 patent is generally directed to methods and apparatuses for "determin[ing] whether [a] first packet is a duplicate packet . . . ." ('557 patent, Abs.) The '557 patent describes various embodiments of packet de-duplication methods and apparatuses.

66.     Apcon has infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '557 patent under 35 U.S.C. § 271(a). Specifically, and without limitation, Apcon has directly infringed at least claim 20 of the '557 patent, in violation of 35 U.S.C. § 271(a), by making, using, selling, offering to sell, and/or importing in or into the United States without authority the Accused Products that meet the limitations of the '557 patent claims. These include at least Apcon's switches with packet de-duplication functionality, including but not limited to Apcon's HyperEngine Packet Processor blades, IntellaFlex Multi-Function Aggregator blades, and IntellaStore II blades.

67.     As one non-limiting example, the Accused Devices directly infringe claim 20 of the '557 patent at least because the Accused Devices practice a method of packet processing (e.g., Apcon's IntellaFlex HyperEngine Packet Processor), comprising: receiving a first packet that includes a header, the header having a plurality of fields, one of the plurality of fields being an identification field (e.g., the HyperEngine deduplication interface in WebXR shows identification fields for incoming packets); determining an identification value for the identification field in the header of the first packet (e.g., the HyperEngine deduplication interface in WebXR shows identification fields for incoming packets with corresponding values); determining whether the

identification value of the first packet matches an identification value in a header of a second packet (e.g., HyperEngine enables removing duplicate packets which requires comparison of packet header values); and using another one of the fields in the header of the first packet to determine whether the first packet is a duplicate packet when the identification value of the first packet matches the identification value of the second packet (e.g., the HyperEngine deduplication interface in WebXR shows identification fields for incoming packets and enables selection of multiple fields for comparison and deduplication); wherein the act of using the another one of the fields comprises: after the act of determining the identification value for the identification field in the header of the first packet, and after the act of determining whether the identification value of the first packet matches the identification value of the second packet, determining whether a first N bits in the header of the first packet match a first N bits in the header of the second packet, N being a value greater than zero (e.g., one of the selectable fields in the HyperEngine interface is a header checksum).

68.     Apcon has also indirectly infringed at least claim 20 of the '557 patent, in violation of  35 U.S.C. § 271(b), by, for example, inducing infringement by third parties—including Apcon's customers—who have used, sold, offered to sell, and/or imported into the United States the Accused Products.  Apcon knows or should know that its actions will induce infringement, it specifically intends to induce infringement, and it has knowledge that the induced acts constitute patent infringement.

69.     Apcon also contributes to the infringement of (and thereby infringes) at least claim 20 of the '557 patent, in violation of 35 U.S.C. § 271(c), by, among other things, using, selling, and/or offering to sell in the United States, and/or importing into the United States, the Accused Products.  Apcon knows or should know that the Accused Products, and/or hardware and software

components thereof, are especially made or adapted for use in infringing the asserted claims of the Patents-in-Suit and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

70.     The facts demonstrating Apcon's indirect infringement are largely the same whether under § 271(b) or § 271(c).  At a minimum, Apcon will have knowledge of all the Patents-in-Suit, Apcon's infringement of the Patents-in-Suit, and infringement of the Patents-in-Suit by the Accused Products, upon service of this Complaint.  Apcon sells the Accused Products to customers in the United States through various retailers or direct to customers.  Apcon encourages, trains, instructs, and provides support and technical assistance to its direct and indirect customers, potential customers, and end users to make infringing use of the Accused Products, such as by publishing and providing technical materials and promotional literature describing and instructing in the infringing use of the Accused Products.  Apcon also actively induces others—e.g., customers, consumers, and Apcon's own employees in the United States—to infringe the Patents-in-Suit by encouraging and facilitating others to perform actions known by Apcon to infringe, including but not limited to the use of the Accused Products.

71.     Gigamon has been and continues to be damaged by Apcon's infringement of the '557 patent.

72.     Apcon's infringement of the '557 patent is exceptional within the meaning of 35 U.S.C. § 285.

## COUNT V

### (Apcon's Infringement of the '656 Patent)

73.     Gigamon re-alleges and incorporates by reference the allegations in paragraphs 1-72 above.

74.     The '656 patent is valid and enforceable.

75.     The '656 patent is generally directed to "a packet switch and a packet switching method" for routing network packets.  ('656 patent, Abs.)  The '656 patent describes various embodiments of the packet switch appliance and method.

76.     Apcon has infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '656 patent under 35 U.S.C. § 271(a).  Specifically, and without limitation, Apcon has directly infringed at least claim 14 of the '656 patent, in violation of 35 U.S.C. § 271(a), by making, using, selling, offering to sell, and/or importing in or into the United States without authority the Accused Products that meet the limitations of the '656 Patent claims.  These include at least Apcon's packet switch device systems for providing data visibility functionality in existing packet switching networks, including but not limited to Apcon's IntellaFlex XR devices and systems.

77.     As one non-limiting example, the Accused Devices directly infringe claim 14 of the '656 patent at least because the Accused Devices are packet switches configured to be connected to a traffic production network and network monitoring instrument, the packet switch comprising: a network port to be connected to the traffic production network, wherein the packet switch is an out-of-band device with respect to the traffic production network, and the network port is configured to receive packets from the traffic production network (e.g., IntellaFlex XR devices such as IntellaFlex 3000-XR or the Series 4000 with devices for port mirroring coupled to the network ports); an instrument port for communication with the network monitoring instrument (e.g., IntellaFlex XR devices such as IntellaFlex 3000-XR or the Series 4000 with instrument ports coupled to tools); and a computer-readable medium containing computer-executable instructions to operate the packet switch, comprising instructions to: establish a logical connection between the network and instrument ports based on a network flow; and forward packets received from the

traffic production network through the network port to the instrument port based on the packets belonging to the network (e.g., Apcon's common software platform enables various connections between network ports and monitoring tools using flow mapping).

78.     Apcon has also indirectly infringed at least claim 14 of the '656 patent, in violation of 35 U.S.C. § 271(b), by, for example, inducing infringement by third parties—including Apcon's customers—who have used, sold, offered to sell, and/or imported into the United States the Accused Products. Apcon knows or should know that its actions will induce infringement, it specifically intends to induce infringement, and it has knowledge that the induced acts constitute patent infringement.

79.     Apcon also contributes to the infringement of (and thereby infringes) at least claim 14 of the '656 patent, in violation of 35 U.S.C. § 271(c), by, among other things, using, selling, and/or offering to sell in the United States, and/or importing into the United States, the Accused Products. Apcon knows or should know that the Accused Products, and/or hardware and software components thereof, are especially made or adapted for use in infringing the asserted claims of the Patents-in-Suit and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

80.     The facts demonstrating Apcon's indirect infringement are largely the same whether under § 271(b) or § 271(c). At a minimum, Apcon will have knowledge of all the Patents-in-Suit, Apcon's infringement of the Patents-in-Suit, and infringement of the Patents-in-Suit by the Accused Products, upon service of this Complaint. Apcon sells the Accused Products to customers in the United States through various retailers or direct to customers. Apcon encourages, trains, instructs, and provides support and technical assistance to its direct and indirect customers, potential customers, and end users to make infringing use of the Accused Products, such as by

publishing and providing technical materials and promotional literature describing and instructing in the infringing use of the Accused Products. Apcon also actively induces others—e.g., customers, consumers, and Apcon's own employees in the United States—to infringe the Patents-in-Suit by encouraging and facilitating others to perform actions known by Apcon to infringe, including but not limited to the use of the Accused Products.

81. Gigamon has been and continues to be damaged by Apcon's infringement of the '656 patent.

82. Apcon's infringement of the '656 patent is exceptional within the meaning of 35 U.S.C. § 285.

## COUNT VI

### (Apcon's Infringement of the '049 Patent)

83. Gigamon re-alleges and incorporates by reference the allegations in paragraphs 1-82 above.

84. The '049 patent is valid and enforceable.

85. The '049 patent is generally directed to "[a] method" and apparatus for "monitoring virtualized network[s]," including "using . . . received information to determine whether to process [a] packet according to a first packet processing scheme or a second processing scheme, wherein the first packet processing scheme involves performing header stripping," and "wherein the second packet processing scheme" does not "perform[] any header stripping." ('049 patent, Abs.) The '049 patent describes various embodiments of the method and apparatus with both header-stripping and non-header-stripping schemes.

86. Apcon has infringed and continues to infringe, literally and/or under the doctrine of equivalents, one or more claims of the '049 patent under 35 U.S.C. § 271(a). Specifically, and without limitation, Apcon has directly infringed at least claim 16 of the '049 patent, in violation

of 35 U.S.C. § 271(a), by making, using, selling, offering to sell, and/or importing in or into the United States without authority the Accused Products that meet the limitations of the '049 patent claims. These include at least Apcon's devices for processing and transmitting packets according to one or another processing scheme based on whether the packet should have its header stripped, including but not limited to Apcon's Series 4000 platform and associated advanced features.

87. As one non-limiting example, the Accused Devices directly infringe claim 16 of the '049 patent at least because the Accused Devices are apparatuses communicatively coupled to a network that includes a virtualized network (e.g., Apcon's Series 4000 platform is a network monitoring apparatus where the network includes a virtualized network), comprising: a port for receiving information regarding the virtualized network along with a packet having a header, the virtualized network contained within one or more physical hosts supporting a virtualized environment, wherein the apparatus is configured to receive the packet in an out-of-band configuration (e.g., Apcon's Series 4000 comprises tunnel termination functionality); a plurality of instrument ports, each of the instrument ports configured for communicatively coupling to a network monitoring instrument (e.g., Apcon's Series 4000 comprises instrument ports communicatively coupled to a network monitoring instrument, instruments, or tools); and a processing unit configured for using the received information (e.g., Apcon's Series 4000 comprises a processing unit for using the received information) to determine whether to process the packet according to a first packet processing scheme or a second packet processing scheme, wherein the processing unit is configured to determine to process the packet using the first packet processing scheme in an event the header of the packet matches the received information and using the second packet processing scheme in an event the header does not match the received information (e.g., Apcon's Series 4000 platform performs the full range of filtering functions available from Apcon,

and Apcon provides multi-level filtering that can be based on Boolean logic that looks specifically at packet headers); wherein the first packet processing scheme involves performing header stripping to remove the header of the packet and performing packet transmission to one of the plurality of instrument ports after the header stripping; and wherein the second packet processing scheme involves performing transmission of the packet having the header to one of the plurality of instrument ports without performing any header stripping (e.g., one of the advanced features of the Apcon 4000 platform is the ability to perform protocol header stripping, and to send packets with stripped (or unstripped) headers to monitoring tools, enabling traffic forwarding to a network monitoring instrument with or without the header(s)).

88.     Apcon has also indirectly infringed at least claim 16 of the '049 patent, in violation of 35 U.S.C. § 271(b), by, for example, inducing infringement by third parties—including Apcon's customers—who have used, sold, offered to sell, and/or imported into the United States the Accused Products.  Apcon knows or should know that its actions will induce infringement, it specifically intends to induce infringement, and it has knowledge that the induced acts constitute patent infringement.

89.     Apcon also contributes to the infringement of (and thereby infringes) at least claim 16 of the '049 patent, in violation of 35 U.S.C. § 271(c), by, among other things, using, selling, and/or offering to sell in the United States, and/or importing into the United States, the Accused Products.  Apcon knows or should know that the Accused Products, and/or hardware and software components thereof, are especially made or adapted for use in infringing the asserted claims of the Patents-in-Suit and are not staple articles or commodities of commerce suitable for substantial non-infringing use.

90.     The facts demonstrating Apcon's indirect infringement are largely the same whether under § 271(b) or § 271(c).  At a minimum, Apcon will have knowledge of all the Patents-in-Suit, Apcon's infringement of the Patents-in-Suit, and infringement of the Patents-in-Suit by the Accused Products, upon service of this Complaint.  Apcon sells the Accused Products to customers in the United States through various retailers or direct to customers.  Apcon encourages, trains, instructs, and provides support and technical assistance to its direct and indirect customers, potential customers, and end users to make infringing use of the Accused Products, such as by publishing and providing technical materials and promotional literature describing and instructing in the infringing use of the Accused Products.  Apcon also actively induces others—e.g., customers, consumers, and Apcon's own employees in the United States—to infringe the Patents-in-Suit by encouraging and facilitating others to perform actions known by Apcon to infringe, including but not limited to the use of the Accused Products.

91.     Gigamon has been and continues to be damaged by Apcon's infringement of the '049 patent.

92.     Apcon's infringement of the '049 patent is exceptional within the meaning of 35 U.S.C. § 285.

### PRAYER FOR RELIEF

93.     WHEREFORE, Gigamon respectfully requests the following relief:

  a) A judgment that Apcon has infringed one or more claims of the '862 patent;

  b) A judgment that Apcon has infringed one or more claims of the '466 patent;

  c) A judgment that Apcon has infringed one or more claims of the '819 patent;

  d) A judgment that Apcon has infringed one or more claims of the '557 patent;

  e) A judgment that Apcon has infringed one or more claims of the '656 patent;

f) A judgment that Apcon has infringed one or more claims of the '049 patent;

g) A judgment that Apcon's infringement of the '862, '466, '819, '557, '656, and '049 patents has been willful;

h) An order and judgment permanently enjoining Apcon and its officers, directors, agents, servants, employees, affiliates, attorneys, and all others acting in privity or in concert with them, and their parents, subsidiaries, divisions, successors, and assigns from further acts of infringement of the Patents-in-Suit;

i) A judgment awarding Gigamon all appropriate damages under 35 U.S.C. § 284 to compensate Gigamon for Apcon's past infringement and any continuing or future infringement of the '862, '466, '819, '557, '656, and '049 patents, including Gigamon's lost profits, up until the date such judgment is entered, and in no event less than a reasonable royalty, and including pre-judgment and post-judgment interest, costs, and disbursements as justified under 35 U.S.C. § 284 and, if necessary to adequately compensate Gigamon for Apcon's infringement, an accounting;

j) A judgment awarding Gigamon all damages, including treble damages, based on any infringement found to be willful, pursuant to 35 U.S.C. § 284, together with pre-judgment interest;

k) A judgment that this case is exceptional and awarding costs and reasonable attorneys' fees to Gigamon pursuant to 35 U.S.C. § 285; and

l) Such other relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Gigamon hereby demands a trial by jury on all claims and issues so triable.

Dated: August 30, 2019

Respectfully submitted,

By: /s/William E. Davis, III
William E. Davis, III
**THE DAVIS FIRM P.C.**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Telephone: (903) 230-9090
Facsimile: (903) 230-9661
bdavis@davisfirm.com

Jonas R. McDavit (*pro hac vice to be requested*)
Cosmin Maier (*pro hac vice to be requested*)
Steven M. Balcof (*pro hac vice to be requested*)
**DESMARAIS LLP**
230 Park Avenue
New York, NY 10169
Telephone: (212) 351-3400
Facsimile: (212) 351-3401
Email:  jmcdavit@desmaraisllp.com
Email:  cmaier@desmaraisllp.com
Email:  sbalcof@desmaraisllp.com

***Counsel for Plaintiff***
***Gigamon Inc.***