# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| **GIGAMON INC.,** | **Civil Action No. 2:19-cv-300-JRG** |
| **Plaintiff,** | **JURY TRIAL DEMANDED** |
| **v.** | |
| **APCON, INC.,** | |
| **Defendant.** | |

## PLAINTIFF GIGAMON INC.'S
## COMBINED MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND
## <u>MOTIONS FOR A NEW TRIAL</u>

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ iii

I. INTRODUCTION ........................................................................................ 1

II. FACTUAL BACKGROUND .......................................................................... 2

III. APPLICABLE LAW ..................................................................................... 2

IV. ARGUMENT ................................................................................................ 3

    A. Gigamon Is Entitled To Judgment As A Matter Of Law Or At Least A New Trial On Its Infringement Claims ................................................ 4

        1. Court Construed the Port Terms and Ordered The Parties To Apply Its Constructions At Trial .................................................. 5

        2. Gigamon Demonstrated That Apcon Infringes The Port Patents ..................... 6

        3. Apcon's Noninfringement Defense For The Port Patents Contradicted The Court's Construction Of The Port Terms And Its Pre-Trial Instructions ................................................................... 8

        4. Gigamon's Infringement Theory Is Supported By Federal Circuit Law—Apcon Ignored That Law .......................................... 11

        5. At A Minimum, Gigamon Is Entitled To A New Trial Because The Court Incorrectly Construed The Port Terms ......................... 14

    B. Gigamon Is Entitled To Judgment As A Matter Of Law Or At Least A New Trial On Apcon's Invalidity Theories .......................................... 16

        1. Apcon Admitted That Any Non-Gigamon Prior Art Does Not Contain Network Ports Or Instrument Ports" ............................. 17

            a. Apcon's Expert Admitted That Claim 14 Of The '656 Patent Was Not Invalid Under The Court's Construction Of "Network Ports" And "Instrument Ports" ............................................. 17

            b. Apcon Failed To Prove Invalidity For The Remaining Claims Of The "Port" Patents ................................................. 18

i

2. There Is No Basis To Conclude That The '862 And '049 Patents Are Invalid In View Of Gigamon's GigaVUE Products ................................. 19

    a. The '862 Patent ........................................................................ 20

    b. The '049 Patent ........................................................................ 22

3. Apcon Failed to Prove Its Obviousness Theories By Clear-and-Convincing Evidence ....................................................................... 23

C. Apcon's Improper "Hedge-Fund" Reference And "Changed Story" Defense Requires a New Trial ............................................................. 25

IV. CONCLUSION ...................................................................................... 29

# **TABLE OF AUTHORITIES**

## **Cases**

*Albritton v. Acclarent, Inc.,*
    2019 U.S. Dist. LEXIS 58496, (N.D. Tex. Jan. 16, 2019) .................................................14

*All Freight Sys. v. James,*
    115 F. App'x 182 (5th Cir. 2004) (non-precedential) .........................................................29

*Allen Eng'g Corp. v. Bartell Indus., Inc.,*
    299 F.3d 1336 (Fed. Cir. 2002) ........................................................................................19

*ArcelorMittal France v. AK Steel Corp.,*
    700 F.3d 1314 (Fed. Cir. 2012) ........................................................................................15

*Avid Tech., Inc. v. Harmonic, Inc.,*
    812 F.3d 1040 (Fed. Cir. 2016) ........................................................................................15

*Bufford v. Rowan Cos.,*
    994 F.2d 155 (5th Cir. 1993) ............................................................................................29

*Colucci v. Callaway Golf Co.,*
    750 F. Supp. 2d 767 (E.D. Tex. 2010)..............................................................................21

*Deering v. Winona Harvester Works,*
    155 U.S. 286 (1894) ..........................................................................................................21

*Dixon v. Int'l Harvester Co.,*
    754 F.2d 573 (5th Cir.1985) ..............................................................................................29

*Dresser-Rand Co. v. Virtual Automation Inc.,*
    361 F.3d 831 (5th Cir. 2004) ..............................................................................................3

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.,*
    276 F. Supp. 3d 629 (E.D. Tex. 2017)..........................................................................2, 3

*Elan Corp., PLC v. Andrx Pharms., Inc.,*
    366 F.3d 1336, 1340 (Fed. Cir. 2004) ..............................................................................19

*Ericsson, Inc, v. D-Link Sys., Inc.,*
    773 F.3d 1201 (Fed. Cir. 2014) ........................................................................................13

*Exergen Corp. v. Wal-Mart Stores, Inc.,*
    575 F.3d 1312 (Fed. Cir. 2009) ....................................................................................5, 18

*Fantasy Sports Props. v. Sportsline.com*,
  287 F.3d 1108 (Fed. Cir. 2002) ................................................................12

*Finnigan Corp. v. U.S. Int'l Trade Comm'n*,
  180 F.3d 1354 (Fed. Cir. 1999) ................................................................20

*Finjan, Inc. v. Secure Computing Corp.*,
  626 F.3d 1197 (Fed. Cir. 2010) .........................................................11, 13

*Hilgraeve Corp. v. Symantec Corp.*,
  265 F.3d 1336 (Fed. Cir. 2001) .........................................................11, 14

*Hiltgen v. Sumrall*,
  47 F.3d 695 (5th Cir. 1995) .......................................................................3

*Hitachi Consumer Elecs. Co. v. Top Victory Elecs. Taiwan Co.*,
  2013 U.S. Dist. LEXIS 133595 (E.D. Tex. Sep. 18, 2013) .......................3

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
  751 F.3d 1327 (Fed. Cir. 2014) ....................................................23, 24, 25

*Laxton v. Gap Inc.*,
  333 F.3d 572 (5th Cir. 2008) .....................................................................3

*Navico Inc., v. Garmin Int'l Inc.*,
  2017 WL 3750252 (E.D. Tex. Jul. 28, 2017) ......................................19, 20, 23

*O2 Micro Int'l Ltd. v. Beyond Innovation Co.*,
  521 F.3d 1351 (Fed. Cir. 2008) ................................................................15

*Pharmastem Therapeutics, Inc. v. Viacell, Inc.*,
  491 F.3d 1342, 1366 (Fed. Cir. 2007) ......................................................24

*Pfizer, Inc. v. Apotex, Inc.*,
  480 F.3d 1348 (Fed. Cir. 2007) ................................................................23

*Polaroid Corp. v. Eastman Kodak Co.*,
  789 F.2d 1556 (Fed. Cir. 1986) ................................................................24

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
  566 F.3d 989 (Fed. Cir. 2009) ..................................................................23

*SanDisk Corp. v. Kingston Tech. Co.*,
  695 F.3d 1348 (Fed. Cir. 2012) ................................................................15

*Silicon Graphics, Inc. v. ATI Techs., Inc.*,
607 F.3d 784 (Fed. Cir. 2010) ......................................................................12

*Smith v. Transworld Drilling Co.*,
773 F.2d 610 (5th Cir. 1985) ..........................................................................3

*Versata Software, Inc. v. SAP Am., Inc.*,
717 F.3d 1255 (Fed. Cir. 2013) ....................................................................12

*Wi-Lan, Inc. v. Apple, Inc.*,
811 F.3d 455 (Fed. Cir. 2016) ........................................................................2

*Wilson v. Johns-Manville Sales Corp.*,
810 F.2d 1358 (5th Cir. 1987) ......................................................................29

**Statutes**

35 U.S.C. § 103 ............................................................................................................23

**Rules**

Fed. R. Civ. P. 50(b) ......................................................................................................2

Fed. R. Civ. P. 59..........................................................................................................2

## I.      INTRODUCTION

In its Opening Statement, Apcon told the jury that Gigamon "changed its story" about Apcon's infringement after it was acquired by a New York-based hedge fund and an "investment authority whose name is redacted."[1]  That left the impression that Gigamon's motivation for filing this lawsuit was not because it believed Apcon infringed, but because a shadowy New York hedge fund pulled strings to extort money from Apcon.

There could no more prejudicial and irrelevant statement in this case than to tell an East Texas jury that Gigamon filed this lawsuit at the behest of a mysterious New York hedge fund. And Apcon made these statements despite clear instruction from the Court that the trial should only be about the patent claims and Apcon's products, not about Gigamon's motivations for filing the lawsuit and certainly not about New York hedge funds.  There is no truth and no evidence that Gigamon filed this lawsuit because of a hedge fund, yet Apcon led with this argument.

And it worked.  The jury returned a verdict that surpassed what Apcon even presented evidence for: a complete finding of noninfringement and invalidity for all of the claims—despite Apcon presenting its defenses as an either-or choice.

Specifically, Apcon presented noninfringement defenses based on a construction that the Court specifically rejected—claiming that only "specialized ports" infringe, not its "generic" ports. Its "generic ports" defense also contravened Federal Circuit precedent regarding apparatus claims where a user simply activates functionality (*e.g.*, a port configuration) already present in the system.  And Apcon seized on a negative limitation that the Court added to the constructions of "network port" and "instrument port" (collectively, the "Port Terms") to raise these improper arguments.  Gigamon established that Apcon was liable for infringement, and Apcon's improper

---

[1] Trial Tr., at 163:23–164:1, 170:10–22.  Excerpts of the trial transcripts cited herein are attached as Exhibit A.

tactics should have never been before the jury.  At a minimum, Gigamon respectfully submits that the Court should have clarified the construction of the Port Terms.

But even more egregious, Apcon put forward an invalidity case that it admits contradicts the Court's claim construction.  Apcon did not evaluate the alleged prior art under the Court's claim construction—as it conceded that it was required to do.  Under Apcon's own logic, a verdict in this case of noninfringement and invalidity would be mutually exclusive.  Thus, a verdict of noninfringement **and** invalidity across all the patents cannot stand as a matter of law.

For these reasons, and those that follow, Gigamon respectfully requests that the Court enter judgment as a matter of law and set this case for a trial on damages and willfulness.  At a minimum, Gigamon requests that the Court grant a new trial.

## II.     FACTUAL BACKGROUND

Gigamon filed this patent infringement action in August 2019.  The Court held a jury trial in April 2021.  Gigamon asserted six claims across five asserted patents: claims 1 and 8 of U.S. Patent No. 8,570,862 ("the '862 Patent"); claim 12 of U.S. Patent No. 8,824,466 ("the '466 Patent"); claim 10 of the 8,873,557 ("the '557 Patent"); claim 14 of U.S. Patent No. 9,077,656 ("the '656 Patent"); and claim 16 of U.S. Patent No. 9,769,049 ("the '049 Patent").  The jury returned a verdict of noninfringement and invalidity, and then the Court entered a final judgment.

## III.    APPLICABLE LAW

After a jury trial, a party may move for judgment as a matter of law or for a new trial.  Fed. R. Civ. P. 50(b); Fed. R. Civ. P. 59.  "Fifth Circuit law determines what legal standards apply to a motion for judgment as a matter of law under Rule 50(b) and a motion for a new trial under Rule 59." *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 276 F. Supp. 3d 629, 643 (E.D. Tex. 2017) (citing *Wi-Lan, Inc. v. Apple, Inc.*, 811 F.3d 455, 461 (Fed. Cir. 2016)). A motion for judgment as a matter of law is a "challenge to the legal sufficiency of the evidence supporting the

jury's verdict." *Id.* (quoting *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 838 (5th Cir. 2004)).  Judgment as a matter of law is appropriate when "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Hitachi Consumer Elecs. Co. v. Top Victory Elecs. Taiwan Co.*, No. 2:10-CV-260-JRG, 2013 U.S. Dist. LEXIS 133595, at *10 (E.D. Tex. Sep. 18, 2013) (citing *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995)).

For a new trial, a movant "must show that 'it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done.'" *Erfindergemeinschaft*, 276 F. Supp. 3d at 643 (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 586 (5th Cir. 2008)).  "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Hitachi*, 2013 U.S. Dist. LEXIS 133595, at *11 (citing *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985)).

## IV.   ARGUMENT

Gigamon is entitled to judgment as a matter of law (or at least a new trial) on infringement and no invalidity.  No reasonable jury would have sufficient evidentiary basis to find for Apcon.

First, under the Court's claim construction, Apcon infringes the asserted claims of four of the five patents presented at trial.  Relevant to those four "Port Patents,"[2] Apcon consistently misrepresented the Court's constructions of the Port Terms as excluding "generic ports" and/or requiring specialized ports.

Second, Apcon did not show that the Port Patents are invalid.  As to non-Gigamon prior art, Apcon ***admitted*** that those references do not contain the required Port Terms under the Court's

---

[2] The '862, '466, '656, and '049 Patents.

claim construction.  And as to Gigamon product prior art, no reasonable jury could conclude that Apcon's on-sale bar invalidity theories were based on sufficient evidentiary support.

Third, with respect to Apcon's various obviousness theories, Apcon did not establish why a person of ordinary skill in the art at the time of the patents' invention dates would have formed each asserted combination.  Apcon relied on the patents themselves as a starting point for its analysis, which is impermissible hindsight.

Last, Gigamon requests a new trial in view of Apcon's inflammatory and irrelevant reference to the nature of Gigamon and its ownership and its accusation that a New York-based hedge fund was the motivation behind Gigamon's lawsuit.  Those tactics irrevocably tainted the trial.  Indeed, Apcon knowingly and intentionally contradicted the Court's repeated instructions that this trial focus on infringement, invalidity, and damages. *E.g.,* 02/22/21 Pretrial Conference Tr., at 162:19–163:5 (attached as Exhibit B); Trial Tr., at 132:14–21, 163:23–164:1, 170:10–22, 299:21–23.  As a result, the Court should at least grant Gigamon a new trial.

### A.    Gigamon Is Entitled To Judgment As A Matter Of Law Or At Least A New Trial On Its Infringement Claims

As discussed below, the evidence Gigamon presented at trial shows that ***under the Court's claim construction***, the Accused Apcon Products[3] include the Port Terms.  Faced with that evidence, Apcon used its noninfringement presentation to mangle the Court's construction of the Port Terms and confuse the jury.  Apcon's defense was a violation of both the Court's prohibition against manipulating its constructions at trial and controlling Federal Circuit law on infringement of apparatus claims.  Thus, the Court should enter judgment as a matter of law on infringement, or, at the very least, order a new trial.

---

[3] The Series 3000 and Series 4000 Apcon Products.

### 1.    The Court Construed the Port Terms and Ordered The Parties To Apply Its Constructions At Trial

"Once a district court has construed the relevant claim terms…then that legal determination governs for purposes of trial.  No party may contradict the court's construction to a jury." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009).  Specifically, the Court issued the following constructions of "network port" and "instrument port":

- "network port": "a port configured to be connected to a network (and not configured to be connected to an instrument)"

- "instrument port": "a port configured to be connected to an instrument (and not configured to be connected to a network)"

Dkt. 114, at 23.  In its analysis, the Court stated that "a single port cannot be both a 'network port' and an 'instrument port' at the same time." *Id.* at 20.  But the Court further recognized that the Port Patents' cover a single port that could operate as a "network port" or an "instrument port" at *different times*, so long as the same port was not configured to operate as a "network port" and an "instrument port" at *the same time*. *Id.* at 21 (reproducing claim 8 of the '466 Patent, wherein the "first network port" is "is *selectively configurable* to function as a network port for packet reception, or an instrument port for packet transmission to a device");[4] *id.* (reproducing Patents' disclosure that "[a] given port may be configured as a network port" or, "[a]lternatively, a port may be configured as an instrument port").  Finally, the Court rejected Apcon's position that the claimed network and instrument ports must be "specifically designated." *Id*. ("[T]he disclosures cited by Defendant do not compel Defendant's proposal that a "network port" or "instrument port" must be "specifically designated.").

Undeterred, Apcon resurrected its "specifically designated" theory as the centerpiece of its noninfringement defense.  Gigamon sought to exclude that improper argument from the trial.  And

---

[4] All emphases are supplied unless otherwise noted.

during the Pretrial Conference, the Court reaffirmed its construction of the Port Terms and reminded the parties to apply the Court's constructions—and only those constructions—at trial. 02/22/21 Pretrial Conference Tr., at 149:20-23 ("I don't expect Dr. Wicker or anybody else to say by construing instrument port and network port, the Court told you that generic ports are not the same and are not covered [by the claim construction.]") (attached as Exhibit B); *see id* at 151:19–25 ("It seems like to me what everybody is dancing around, and maybe I'm wrong here, but there may be, as I recall, some language in the claim construction opinion that says: Generic ports don't meet the limitations of network ports or instrument ports. And, you know, that's exactly the kind of analysis that should not come in during the trial before the jury."). And the Court warned both parties that "intentional efforts to ignore that order of the Court will be met with a serious response and an appropriate response by the Court." *Id.* at 153:20-22. Apcon did not heed that warning.

### 2.    Gigamon Demonstrated That Apcon Infringes The Port Patents

Gigamon focused its infringement case on the only appropriate analysis—a comparison between the asserted claims as construed by the Court and the Apcon Accused Products. *See, e.g.,* Trial Tr., at 384:12–385:18, 390:21–400:23, 477:13–480:12 (Gigamon expert testimony); 02/22/2021 Pretrial Conference Tr., at 143:23–144:3 ("The only proper comparison for purposes of infringement are the accused products to the language of the claims. That's where it starts, and that's where it stops. And to stray from that is a recipe for confusion and problems with the jury that I don't intend to open the door to.") (attached as Exhibit B).

The evidence showed—without a doubt—that the Apcon Accused Products infringe the Port Patents. As a threshold matter, Gigamon proved the Apcon Accused Products meet the affirmative requirements in the Court's constructions. They include ingress ports configured to be connected to a network—depicted in blue in the Apcon video image below—and they include

egress ports configured to be connected to an instrument—depicted in orange in the Apcon video image below.[5]



PTX-0311, at 1:44 (truncated image).[6]

The Accused Apcon Products also meet the second—negative—portion of the Court's construction.  Ports on the Accused Products configured to be "network ports" are "not configured to be connected to an instrument" and ports configured to be "instrument ports" are "not configured to be connected to a network."  Dkt. 114, at 23.  Specifically, the ingress ports depicted in blue connect to a network and at that that time, they connect only to the network—not an instrument.  *See, e.g.*, Trial Tr., at 801:15–25, 803:2–14 (Apcon engineer Gerry Murphy describing the section

---

[5] *See also, e.g.*, PTX-0184.0042 (Apcon user manual depicting port receiving traffic "in from *network* traffic being monitored" and depicting port sending traffic "[o]ut to analysis tools"); PTX-0792.0011 (Apcon presentation explaining Apcon software "[a]llows customers to preassign ports for ingress" with port class labeled "'Span' (ingress traffic)" and "[a]llows customers to preassign ports for . . . egress" with port class labeled "'Analyzer' (egress traffic)"); PTX-0792.0032 (Apcon presentation stating "Span – port can *only* be used as ingress ports" and "Analyzer – ports can *only* be used as egress ports"); Trial Tr., at 1011:23–25 (Apcon expert Dr. Wicker agreeing that "span mean[s] the network" and "analyzer [means] the tool or instrument ); PTX-0264.0049–50; PTX-0082.0003; PTX-0170.254–255; PTX-0147.0005; Trial Tr., at 384:12–385:23, 390:21–398:14, 403:25–404:23, 415:18–416:9, 419:25–420:23, 477:15–480:12, 776:23–778:12, 801:19–25, 803:7–12.  Excerpts from all of Plaintiff's exhibits cited in this brief are attached as Exhibit C.
[6] *See also* PTX-0264.0049–50 (graphical user interface and instructions for the Series 4000 Products).

7

process for designating ports and agreeing that "[o]nce the port is blue, it can ingress . . . [a]nd in this connection, it doesn't egress . . . [a]nd therefore, it's restricted[.]").[7]  Likewise, the egress ports depicted in orange connect to instruments and at that that time, they connect only to an instrument—and not the network.  *Id.* at 802:1–5 (providing testimony with respect to instruments).[8]  Apcon did not dispute any of these facts at trial.  In fact, Apcon's Chief Executive Officer ("CEO"), Richard Rauch, admitted that a single port on the Apcon Accused Products could not function as a network port and an instrument port at the same time:

> Q:     On the Apcon products that Gigamon is accusing of infringement in this case, could a network be plugged into the same port as a tool and still work?
>
> A:     Not at the same time, no.

Trial Tr., at 622:13–16.[9]  In sum, Gigamon demonstrated the Apcon Accused Products satisfy both the affirmative and negative limitations of the Court's construction of network port and instrument port, and therefore proved that Apcon infringes the Port Patents.

### 3.     Apcon's Noninfringement Defense For The Port Patents Contradicted The Court's Construction Of The Port Terms And Its Pre-Trial Instructions

The sole infringement dispute as to the Port Patents was whether the Apcon Accused Products include network ports and instrument ports.  Apcon's expert, Dr. Wicker, conceded that the Apcon Accused Products meet all of the other limitations and agreed that if he was wrong about the Port Terms, then the jury "should find infringement on all four of those patents."  Trial

---

[7] *See also, e.g.*, Trial. Tr., at 434:23–435:06 (Dr. Almeroth explaining that a port cannot be in a "network port configuration"—represented with a blue label—and an "instrument port configuration"—represented with an orange label—***at the same time***.").

[8] *See also, e.g.*, Trial Tr., at 396:22–397:02 (Dr. Almeroth explaining that "if [an egress port is] going to an instrument, it's not going to a network port.").

[9] *See also* Trial Tr., at 622:18-24 ("Q [I]f I'm asking you about one port in the Apcon products accused of infringement, could a network be plugged into that port? A. Yes.  Q. Could a tool or instrument be plugged into that same port in the Apcon Device? A. No, not at the same time.").

Tr., at 1016:23–1017:7; *see also id.* at 888:15-22 ("Q. (By Apcon's Counsel) Now, based on your analysis in this case, Dr. Wicker, do the Apcon accused products infringe Claim 14 of the '656 patent? A. No. Q. Why not? A. Because there are no network ports or instrument ports as called for in the claim and as construct -- construed by the Court."); 969:2–17 (on direct, Dr. Wicker's summary of his noninfringement analysis focusing only on the Port Terms); 998:10–18 (Dr. Wicker agreeing that the only parts of the Port Patents in dispute was the Port Terms).

Apcon claimed that its products' ports are "generic" and not "specialized" (or "restricted") because Apcon's customers could select and change whether a port was a network port or an instrument port.  *See, e.g.*, Trial Tr., at 179:11–180:2, 870:25–875:20.  But that rehashed Apcon's already-rejected claim construction position.  *See, e.g.*, Dkt. 114, at 21 (rejecting Apcon's "specifically designated" proposed language); *see also* 06/25/21 Claim Construction Tr., at 42:10–11 (Apcon's counsel arguing that "specifically designated" required a designation of the port "before it's ever connected to anything") (attached as Exhibit D); *id.* at 46:2–3 ("The port has to be configured as a network port or an instrument port before you ever plug it into anything."); 02/22/21 Pretrial Conference Tr., at 149:20–23 (attached as Exhibit B).  Apcon ignored the Court's Claim Construction Order finding and Pretrial Conference admonition and argued that it cannot infringe because it uses "generic" ports.

Apcon then argued that the ingress and egress ports in the Accused Products cannot be network and instrument ports under the Court's claim construction.  Trial Tr., at 885:14-19 ("Q. Are these ingress ports and egress ports the same as network ports and instrument ports in the Court's construction?  A. No, they're not. All we know when we see ingress port is that packets are coming in. All we know when we see egress ports is that packets are going out…"); *id.* at 885:20–886:19 (Apcon's technical expert further explaining why ingress/egress ports do not meet

9

the Court's claim construction).  But that argument ignores the language of the Port Patent claims themselves.  As Dr. Wicker himself agreed in the context of claim 14 of the '656 Patent, "a network port receives information" and "an instrument port sends out information":

> Q:     Right. So in this claim, you have a network port that receives information, you have an instrument port that sends out information, right?
>
> A:     That's correct.

Trial Tr., at 1002:14–17.  And as Dr. Wicker also agreed, the terms network port and instrument port, as used in claim 14 of the '656 Patent have the same meaning, respectively, as ingress and egress, the terms Apcon assigns to the ports in the Accused Products:

> Q:     And, again, the receiving side is the ingress?
>
> A;     That's another term, yes.
>
> Q:     And the output side where the instrument port here is the egress, right?
>
> A:     That's correct.
>
> Q:     And that's the way Claim 14 is set up, right?
>
> A:     That's correct.

Trial Tr., at 1002:23–1003:4.

> Q:     And the idea of having an ingress port be the network port, that's consistent with Claim 14, right?
>
> A:     Yes.
>
> Q:     And the instrument port being an egress port, that's consistent with Claim 14 of the '656 patent, right?
>
> A:     That's correct, as well.

Trial Tr., at 1013:2–7.  Thus, Dr. Wicker conceded that a product with "a network port for receiving a packet"—which he testified can be an "ingress port"—and an instrument port—which he testified can be an "egress port"—infringes claim 14 of the '656 Patent:

> Q:   So if an apparatus does that, does all these things, it sets up a network port for receiving a packet, an instrument port, as in the claim, and then connects them as the last element says to do, that would infringe, right?
>
> A:   If you satisfy every limitation of the claim, you infringe, that's right.

Trial Tr., at 1003:5–10.  In light of Dr. Wicker's testimony that the claimed network port is the same an ingress port and the claimed instrument port is the same as an egress port, no reasonable jury could find noninfringement based on Apcon's ingress/egress port argument.

For those reasons, a finding of noninfringement based on Apcon's ingress/egress port argument is legal error.

### 4.   Gigamon's Infringement Theory Is Supported By Federal Circuit Law—Apcon Ignored That Law

At trial, Gigamon asserted only system claims from the Port Patents.  Each of those claims was directed to systems with ports performing particular functions—*i.e.*, "network port for receiving a packet" and/or an "instrument port for communication with a network monitoring instrument."  '656 Patent, claim 14; *see, e.g.*, 862 Patent, claim 1; '466 Patent, claim 12; '049 Patent, claim 16 (instrument port only).  To prove infringement of a system claim that recites a function—like those in the Port Patents—one needs to show that the accused product is reasonably capable of performing the claimed function.  *See Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001) ("[A]n accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of noninfringing modes of operation.") (compiling precedent on this point); *also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204–05 (Fed. Cir. 2010) (holding that claim elements "for" performing certain functionality reflected that the claims were drawn to capabilities).

Specifically, if a user need only activate functionality that is already in the device, that device is considered capable of that functionality for the purposes of infringement.  *E.g.*, *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1263 (Fed. Cir. 2013) (upholding infringement judgment where infringing functionality was not the result of modifying or altering the code, but was the result of following the defendant's own directions to "activate[] functions already present in the software"); *Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 794 (Fed. Cir. 2010) ("[T]his court has held that an apparatus claim directed to a computer that is claimed in functional terms is nonetheless infringed so long as the product is designed 'in such a way as to enable a user of that [product] to utilize the function . . . without having to modify [the product].'") (quoting *Fantasy Sports Props. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002)).

Gigamon proposed jury instructions consistent with this case law, Gigamon's Proposed Final Jury Instructions, at 14 (attached as Exhibit E), but the Court's Final Jury Instructions did not address this legal issue, allowing Apcon to leave the jury with an incorrect understanding of the law.  Trial Tr., at 1218:16–1219:3 (Gigamon's counsel's objection at the formal charge conference that the proposed instruction was not included in the final jury instructions.).  Indeed Apcon continued to press its (incorrect and rejected) theory that the Court's claim construction "clearly specifies *a particular configuration*," and then citing cases that suggest capability is not sufficient.  Exhibit E, at 14n.15 (emphasis in original).  But this case is not about capability, it is about the actual use of the Apcon Accused Products as advertised, marketed, and sold by Apcon.  *E.g.* PTX-0311 (Apcon video demonstrating the configuration of its product).

Gigamon presented substantial evidence that Apcon's Accused Products are reasonably capable of infringing the Port Patents.  *See, e.g.*, PTX-0311, at 1:35–1:47, PTX-0264.0049–50.  Apcon sells the Accused Products with "network port" and "instrument port" functionality that

satisfies the Court's construction of those terms, and Apcon's customers merely need to activate it.  *See, e.g.*, Trial Tr., at 783:1-21(Apcon engineer agreeing that the software to control connections to networks and instruments is built into the Apcon Accused Products).[10]  Moreover, Gigamon proved that Apcon instructs Apcon's customers to use the Accused Products in infringing configurations and advertises those configurations (*see, e.g.*, PTX-0311, at 1:35–1:47, PTX-0264.0049–50) activates the "network port" configuration (and the port can only connect to a network) or the "instrument port" configuration (and the port can only connect to an instrument).

The functionality does not allow the port to be configured as a "network port" and an "instrument port" at the same time—there is no such configuration in the software, and Apcon did not allege that there was any such functionality.  Thus, similar to *Finjan*, "it is undisputed that software for performing the claimed functions existed in the products when sold—in the same way that an automobile engine for propulsion exists in a car even when the car is turned off."  626 F.3d at 1205; Trial Tr., at 567:2–17 (explaining how, like the ports in the accused products, an automobile has mutually exclusive configurations for drive and reverse and the user selects which configuration to utilize when operating the car).  Apcon never disputed these facts, and the inquiry should have ended there.  *Cf. Ericsson, Inc, v. D-Link Sys., Inc.*, 773 F.3d 1201, 1217 (upholding judgment where "there is evidence that the accused device is *actually used* in an infringing manner and can be so used without significant alterations") (emphasis in original) .

In direct violation of *Hilgraeve* and its progeny, Apcon argued it does not infringe the Port Patents because the Accused Products are shipped with "generic" **physical** ports that the user needs to configure, that the user can change the configuration, and that there are alleged configurations

---

[10] *See also* Trial Tr., at 371:16–372:14, 373:15–375:22, 390:21–398:14, 403:25–404:23, 415:18–416:9,  419:25–420:23,  425:7–25,  426:15–25,  428:6–431:4,  432:18–433:17,  434:15–440:9, 443:13–443:23; 444:7–25, 454:8–454:25, 477:15–480:12.

that do not infringe.  In other words, Apcon argued it does not infringe system claims that cover functionality because the Apcon Accused Products are only capable of infringing.  That argument is legally wrong under *Hilgraeve* and should have never been presented.

### 5.  At A Minimum, Gigamon Is Entitled To A New Trial Because The Court Incorrectly Construed The "Port" Terms

Gigamon respectfully submits, in the alternative, that post-trial relief is warranted because the Court incorrectly construed the "port" terms.  The Court adopted a construction that neither side proposed.  *See* Dkt. No. 212 at 1 ("In the claim construction Memorandum Opinion, the Court construed two terms—Instrument Port and Network Port (the "Port Terms")—in a manner that differed from either party's proposed constructions.").  It added a limitation that a "network port" could not be "configured to be connected to an instrument" and *vice versa*.  *Id*. at 3.  But the Court did not identify the type of clear limiting statement or disavowal that justifies the inclusion of such a requirement.  *See, e.g.*, *Albritton v. Acclarent, Inc.*, 2019 U.S. Dist. LEXIS 58496, at *12 (N.D. Tex. Jan. 16, 2019) ("It is generally improper to import negative limitations when construing a claim term, unless the patent contains an explicit disavowal.").

Also, though the Court explained in its Claim Construction Order that "a single port cannot be both a 'network port' and an 'instrument port' *at the same time*," Dkt. 114, at 20, it omitted that critical clarification from its actual Port Term constructions.  In other words, the Court's construction did not explain *when* a "network port" could not be configured to connect to an instrument or *vice versa*.  Those omissions unfairly prejudiced Gigamon because it opened the door for Apcon to advance its legally improper and confusing "generic port" argument.

Apcon's improper noninfringement argument requires judgment as a matter of law—as it was Apcon's only infringement defense for the Port Patents—or at a minimum, a new trial under the correct construction of the "port" terms. As shown above, Apcon based its entire

14

noninfringement defense on an incorrect construction of the claims, which unfairly prejudiced Gigamon.  *See, e.g.*, *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1325 (Fed. Cir. 2012) (explaining that an incorrect claim construction may require a new trial where the construction prejudiced the moving party); *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1047 (Fed. Cir. 2016) (collecting authority for a new trial based on an incorrect claim construction); *O2 Micro Int'l Ltd. v. Beyond Innovation Co.*, 521 F.3d 1351, 1359–60 (Fed. Cir. 2008) (explaining that trial objection to the district court's construction is not required to preserve the issue); *SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1355 (Fed. Cir. 2012) (explaining that a party was not "required to repeat its unsuccessful construction arguments to the district court during summary judgment to preserve the issue for appeal").  At a minimum, the parties' differing views on the claim construction—and how to apply it—presented an *O2 Micro* issue should have been resolved before sending the case to the jury.  *See, e.g.*, Trial Tr., at 573:25–579:8 (Gigamon's objection raising a claim-construction dispute).

*   *   *   *   *

In sum, Apcon's "generic port" defense was inconsistent with the Court's Claim Construction Order, its pretrial instructions, and Federal Circuit law on infringement of apparatus claims.  It also confused the jury and unfairly prejudiced Gigamon.  Because Apcon's "port" defense was the only basis upon which Apcon disputed infringement of the Port Patents at trial, and Gigamon established infringement as a matter of law under the correct legal standards, judgment as a matter of law is appropriate.

In the alternative, a new trial is warranted.  The great weight of the evidence Gigamon presented at trial demonstrated Apcon's infringement.  Apcon's main defense—which Gigamon objected to during the trial (*see* Dkt. 287; Trial Tr., at 573:25–579:8)—was improper, irrelevant,

15

and unfairly prejudicial as it only served to confuse the jury on the key Port Term issue.  These circumstances require a new trial.

### B. Gigamon Is Entitled To Judgment As A Matter Of Law Or At Least A New Trial On Apcon's Invalidity Theories

Apcon advanced eight separate invalidity theories at trial.  Each theory suffers one or more flaws that precludes a judgment of invalidity.  First, with respect to claim 14 of the '656 Patent, Apcon admitted that its invalidity and noninfringement theories are mutually exclusive.  Apcon concedes that the alleged invalidity reference—a Juniper technical manual and the '656 patent admitted prior art—do not disclose either of the Port Terms under the Court's claim construction. Likewise, with respect to any non-Gigamon system art used with any other patent, Apcon admits that those references do not disclose either of the Port Terms under the Court's claim construction.

Second, there is no evidence under which a reasonable jury could find that Gigamon sold embodying products before the critical date for the patent application.  Finally, beyond Apcon's bare conclusory assertions, there was no evidence that a person of ordinary skill in the art would have been motivated to combine the references in any alleged obviousness combination.  Instead, using impermissible hindsight, Apcon relied on the patents themselves as roadmaps to piece together disparate pieces of art.  The Court should enter judgment as a matter of law on each of Apcon's invalidity theories, or at a minimum, grant Gigamon a new trial.[11]

---

[11] After the close of evidence, during FRCP Rule 50(a) arguments, Apcon's counsel mentioned that Apcon had presented evidence through Dr. Wicker that the GigaVUE-MP "3 Minute Overview" document anticipated the '862 patent.  Trial Tr., at 1192:20–25.  Apcon did not rely on that reference as an anticipation reference during trial.  And Apcon did not attempt to show that reference disclosed every limitation of the '862 Patent. *See e.g.,* Trial Tr., at 933:12-14 (Dr. Wicker opining that the GigaVUE-MP system included the claimed processing unit, but not that the GigaVUE-MP "3 Minute Overview" document disclosed a processing unit).

        1.        **Apcon Admitted That Any Non-Gigamon Prior Art Does Not Contain Network Ports Or Instrument Ports**

        a.        **Apcon's Expert Admitted That Claim 14 Of The '656 Patent Was Not Invalid Under The Court's Construction Of "Network Ports" And "Instrument Ports"**

Claim 14 of the '656 Patent recites the "network port" and "instrument port" claim elements.  It was undisputed that Apcon's prior art references did not disclose those elements, under the Court's construction.  Apcon asserted two invalidity theories—the prior art discussed in the '656 Patent itself (the "admitted prior art" or "'656 APA") and the Juniper reference.[12]  But Apcon's expert, Dr. Wicker, admitted on cross-examination that neither reference teaches the claimed "network port" and "instrument port" terms, as construed:

> Q:    But you don't actually believe that the Juniper reference has network ports and instrument ports, true?
>
> A:    Under the Court's claim construction, yes, that's correct.
>
> Q:    And under the Court's constructions, in your view, the Juniper reference does not have network ports or instrument ports, true?
>
> A:    That's correct. . . .
>
> Q:    And you don't even believe that the admitted prior art, as you call it, invalidates the patents under the Court's construction, right?
>
> A.    By the -- by itself, no.

Trial Tr., at 972:15–973:19, 983:8–11; *see also id.* at 922:5–13 (testifying that, for the admitted prior art, its disclosure of ports was not "enough to satisfy the Court's claim construction" of the Port Terms).  Dr. Almeroth similarly concluded that the '656 APA and the Juniper reference did

---

[12] JUNOS™ Internet Software Feature Guide, Release 5.6 (the "Juniper reference").

not anticipate claim 14.  *Id.* at 1084:18–21, 1088:5–25.  Thus, the jury had ***no basis*** to find that claim 14 of the '656 Patent was invalid, and judgment as a matter of law is appropriate.

Moreover, based on Apcon's trial theories, the jury's verdict was also inherently inconsistent.  Apcon presented a mutually-exclusive defense: that it did not infringe, but should the jury find infringement—"to the extent one agrees" with Gigamon's experts' "application of the claim construction" for infringement—the claim would then be invalid.  Trial Tr., at 921:18–922:4 (direct testimony of Dr. Wicker).  That was improper in and of itself; the actual claim construction controls, not characterizations of how a party "applies" the construction.  *Exergen*, 575 F.3d at 1321.  Regardless, the jury ***found noninfringement***.  At that point, there was no basis to also find invalidity.  The jury thus entered an inconsistent verdict, requiring judgment as a matter of law.

At a minimum, Gigamon is entitled to a new trial on invalidity due to Apcon's improper invalidity defense and the inconsistent verdict, as well as the corollary infringement issues outlined above (*e.g.*, Apcon's violation of the Court's *Markman* rulings, Apcon raising a defense that contradicts Federal Circuit authority, and the Court's incorrect construction of the Port Terms).

      **b.**      **Apcon Failed To Prove Invalidity For The Remaining Claims Of The "Port" Patents**

Apcon also failed to prove invalidity of claims 1 and 8 the '862 Patent, claim 12 of the '466 Patent, and claim 16 of the '049 Patent.  Apcon relied on the '656 APA, the Juniper references,[13] Tadimeti,[14] and Daniel[15] references—none of which, as Dr. Wicker admitted, disclose the Port Terms, as construed.  Trial Tr., at 972:15–973:19, 981:7–10, 983:8–11, 984:24–

---

[13] JUNOS™ Internet Software Feature Guide, Releases 7.4 (for the '466 patent) and 8.1 (for the '862 and '049 patents).
[14] U.S. Patent No. 7,656,812 to Tadimeti et al.; Apcon referred to this patent as "Cisco."
[15] U.S. Patent No. 7,706,363 to Daniel et al.; Apcon referred to this patent as "Marvell."

985:21, 986:10–12, 988:8–12, 992:1–993:1.  As a result, none of those references by themselves can anticipate those claims.  And for the same reasons as claim 14 of the '656 Patent, judgment as a matter of law or at least a new trial is warranted for these bases of invalidity for the '862, '466, and '049 Patents to the extent Apcon relies on any of these references as teaching the Port Terms. Apcon's only other invalidity theories for those patents are based on Gigamon's own products.  As discussed below, Apcon failed to carry its burden regarding that invalidity theory as well.

### 2.    There Is No Basis To Conclude That The '862 And '049 Patents Are Invalid In View Of Gigamon's GigaVUE Products

Apcon asserted that the '862 and '049 Patents are invalid based on an "on-sale bar" invalidity theory.  To show that a patent is invalid under the statutory on-sale bar, the challenger must demonstrate by clear-and-convincing evidence that the patentee's product was available more than one year prior to the patent priority date and met each and every limitation of the asserted claim.  *Elan Corp., PLC v. Andrx Pharms., Inc.*, 366 F.3d 1336, 1340 (Fed. Cir. 2004); *see Navico Inc., v. Garmin Int'l Inc.*, 2:16-cv-190-JRG-RSP, 2017 WL 3750252, at *2 (E.D. Tex. Jul. 28, 2017) ("To establish an on-sale bar, the party asserting invalidity must show the sold device fully anticipated the claimed invention or would have rendered the claimed invention obvious." (citing *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1352 (Fed. Cir. 2002).), *report and rec. adopted*, No. 2:16-cv-190-JRG-RSP, 2017 WL 3764213 (E.D. Tex. Aug. 29, 2017).

Apcon based its on-sale bar theory as to the '862 Patent on the Gigamon GigaVUE-MP product and its on-sale bar theory as to the '049 Patent on the Gigamon GigaVUE 2404 with GigaSMART.[16]  Post-trial relief is appropriate because Apcon did not meet its burden with regard

---

[16] Collectively, the GigaVUE-MP and GigaVUE 2404 with GigaSMART are referred to as the "GigaVUE products."

to either on-sale bar argument as a matter of law and the great weight of the evidence confirmed the validity of the impacted claims.

### a.     The '862 Patent

To prove claims 1 and 8 of the '862 patent was invalid, Apcon was required to demonstrate that the GigaVUE MP product on sale as of February 2, 2006 met each limitation of the claims.[17] In support of that theory, Apcon relied on a non-prior art document dated June 21, 2007—over one year after the critical date—to demonstrate the functionality of the GigaVUE-MP product that was on sale prior to the critical date. *See, e.g.*, Trial Tr., at 934:17–935:8; DDX-4.112 and 4.114 (citing DTX-0379,[18] a presentation dated June 21, 2007) (attached as Exhibit G). That June 2007 document does not (and cannot) support the functionality of the pre-critical date version of the GigaVUE-MP product, and it is and remains Apcon's burden to demonstrate that the pre-critical date product "includes the limitations of the asserted claims." *Navico*, 2017 WL 3750252, at *4. Even assuming that the 2007 document discloses elements of the asserted claims of the '862 Patent, the document itself is silent as to the functionality of the ***pre***-critical date version of Gigamon-MP.

Perhaps cognizant of that deficiency, Apcon played the deposition testimony of King Won, one of Gigamon's founders, as to the functionality of the pre-critical date GigaVUE product. But that oral testimony was insufficient as a matter of law to prove that the pre-critical date GigaVUE-MP product met each limitation of claims 1 and 8 of the '862 Patent. *See, e.g., Finnigan Corp. v. U.S. Int'l Trade Comm'n*, 180 F.3d 1354, 1366 (Fed. Cir. 1999) (explaining that "[t]he law has long looked with disfavor upon invalidating patents on the basis of mere testimonial evidence absent other evidence that corroborates that testimony" and reversing public-use finding because

---

[17] The critical date for Apcon's on-sale bar defense was February 2, 2006, one year before the patent's priority date. Dkt. No. 236 (Pretrial Order), ¶ 4.
[18] Excerpts from all of Defendant's exhibits cited in this brief are attached as Exhibit F.

the testimony was "not corroborated by other evidence" and a contemporaneous article was "ambiguous at best concerning the claimed use" of the invention); *Colucci v. Callaway Golf Co.*, 750 F. Supp. 2d 767, 774-75 (E.D. Tex. 2010) (holding that the law "requires a more definitive confirmation" of when an alleged prior art product was on sale beyond testimony from a witnesses that he "'was pretty sure' that the [allegedly prior art] RAM Little Z was sold under certain dates and conditions and he relied on a third party's 'belief' to establish the on-sale date as being in 1985"); *see also Deering v. Winona Harvester Works*, 155 U.S. 286, 301 (1894) (explaining that oral of invalidity is "peculiarly untrustworthy," regardless of a witness's interest in the case).

Moreover, relying on Mr. Won's testimony demonstrates why oral testimony is insufficient to support invalidity.  His testimony did not verify that a pre-critical date version of GigaVUE-MP embodied the asserted claims of the '862 Patent.  Mr. Won is retired and left Gigamon almost 10 years ago.  Trial Tr., at 815:17–25.  And Mr. Won's testimony was unclear on its own terms. Although Apcon's counsel attempted to lead Mr. Won into endorsing Apcon's theory about how GigaVUE **may have functioned in 2005**, the witness expressly qualified that his "recollection is not exactly crystal clear on the time frames and what was in what."  Trial Tr., at 821:10–17, 990:18–991:6.  Mr. Won emphasized his doubts concerning his recollection of specific contents of specific products on specific dates:

> Q:     And once you assign or configure a port as a network port,
>        it can't act as a tool port unless you change the configuration,
>        right?
>
> A:     Correct. Could I make a point here?
>
> Q:     Sure.
>
> A:     ***Many of these things that you are asking me is things that***
>        ***happened a long time ago. I haven't looked at them in, like,***
>        ***years. So I want to put the caveat in place that my***
>        ***recollection is not exactly crystal clear on the time frames***
>        ***and what was in what***.

21

So I just want to make that clear, okay?

Q:    (Apcon's counsel) Okay. Yeah, we're – we're not going to hold you to any standard other than your best recollection, so no problem there.

Trial Tr., at 821:5–20.  As a matter of law, this testimony was not clear-and-convincing evidence sufficient to invalidate the '862 Patent.  On this record, Apcon's defense simply fails as a matter of law and the jury's verdict was against the great weight of the evidence.

### b.    The '049 Patent

Apcon also failed to prove that the GigaVUE-2024 with GigaSMART was prior art to the '049 Patent.  The parties agreed that critical date for Apcon's on-sale bar defense was July 27, 2011, one year before the patent's priority date.  Dkt. No. 236 (Pretrial Order), ¶ 14.  But the functionality that Apcon pointed to as invalidating the '049 Patent claims was not targeted for release until July 29, 2011.  *See, e.g.*, Trial Tr., at 1098:16–1102:11; PTX-0352.0001 (target release date of July 29, 2011).  Apcon relies on a user guide dated after the critical date—August 29, 2011—to try to prove that a pre-critical date version of that product contained certain functionality.  *See, e.g.*, Trial Tr., at 1098:16–1102:11; DTX-0138.0002 (August 29, 2011).  To fill that gap, once again, Apcon cites the testimony of Mr. Won in which he provides equivocal (at best) testimony that a prior version of a GigaVUE product had "header stripping."  *See, e.g.*, Trial Tr., at 825:22–25.  But Mr. Won expressly testified that he "did not recall" what the functionality was in that product as of the critical date, and, at most, agreed that a decade-old press release indicated that a Gigamon product had "header stripping" as of the critical date.  *Id.* at 825:5–25.

Moreover, even if it were true that "header stripping" was available, that does not establish that the pre-critical date product meets each limitation of claim 16 of the '049 Patent.  *See, e.g.*, *Navico*, 2017 WL 3750252, at *4.  And Mr. Won's express qualifications of his testimony regarding dates and specific functionality of products as of a specific date equally apply to Apcon's

on-sale bar theory for the '049 Patent.  And the same problems associated with oral testimony described above apply here too, and Apcon cannot as a matter of law demonstrate otherwise.

*     *     *     *     *

The gaps in Apcon's GigaVUE-based invalidity defenses require entry of judgment as a matter of law.  At a minimum, a new trial is appropriate because the great weight of the evidence did not support an invalidity verdict.

### 3.     Apcon Failed to Prove Its Obviousness Theories By Clear-and-Convincing Evidence

To demonstrate obviousness, a patent challenger must prove by clear-and-convincing evidence that a skilled artisan at the time of the invention would have been motivated to combine multiple references and would have had a reasonable expectation of success in doing so.  35 U.S.C. § 103(a); *see InTouch Techs., Inc. v. VGO Commc'ns, Inc*., 751 F.3d 1327, 1347 (Fed. Cir. 2014) (citing *Procter & Gamble Co. v. Teva Pharm. USA, Inc*., 566 F.3d 989, 994 (Fed. Cir. 2009) and *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007)).  Conclusory expert testimony and/or hindsight bias is not enough to satisfy that burden.  *Id.* at 1352.

Apcon failed to prove its only invalidity theory for the '466 Patent—an obviousness combination of Daniel, the '656 APA, and the GigaVUE-MP 3 Minute Overview.  Specifically, Apcon did not demonstrate a skilled artisan would be motivated to combine those references with a reasonable likelihood of success.  Trial Tr., at 958:10–960:4; DDX-4.162 (attached as Exhibit G).  To the contrary, Apcon offered ***only*** Dr. Wicker's conclusory statement that the combination would not be "that difficult."  Trial Tr., at 959:20–21.  Under *InTouch*, such conclusory expert testimony falls well short of the clear and convincing standard.  751 F.3d at 1352.

Apcon also failed to prove its only invalidity theory for the '557 Patent—an obviousness combination of Winter and the '656 APA.[19]  First, the Patent Office considered **both** references during prosecution.  *See, e.g.*, Trial Tr., at 994:3–13, 1157:1–1158:21.  "When the party asserting invalidity relies on references that were considered during examination or reexamination, that party 'bears the added burden of overcoming the deference that is due to a qualified government agency presumed to have done its job.'"  *Pharmastem Therapeutics, Inc. v. Viacell, Inc.*, 491 F.3d 1342, 1366 (Fed. Cir. 2007) (quoting *Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556, 1560 (Fed. Cir. 1986)).  Apcon failed to discharge its invalidity burden here.

Second, neither reference teaches using packet header fields to identify duplicate packets—the main thrust of the '557 Patent.  The '656 APA does not relate to de-duplication and Winter teaches identifying duplicate packets using a field in the trailer—not the header.  DTX-0108.0003; Trial Tr., at 1158:23-1159:19; *see id.* at 964:4–25 (Dr. Wicker on direct identifying the CRC code as a "checksum" located in the **trailer** of the packet).  Finally, as with the '466 Patent, Apcon did not demonstrate that a skilled artisan at the time of the invention would have been motivated to combine the two identified references with a reasonable likelihood of success.  Apcon again offered only Dr. Wicker's conclusory testimony on this point (Trial Tr., at 962:18–21)—which is insufficient as a matter of law.  *InTouch*, 751 F.3d at 1352.

Because Apcon failed to carry its burden as to obviousness of the '466 and '557 Patents and because obviousness is ultimately a matter of law, judgment as a matter of law is appropriate or at a minimum, the Court should grant a new trial on the validity of those two patents.

---

[19] U.S. Patent Publication No. 2009/0073897 to Winter; Apcon referred to this publication as "Dell."

### C.   Apcon's Improper "Hedge-Fund" Reference And "Changed Story" Defense Requires a New Trial

In its Opening Statement, Apcon claimed this suit was meritless because two entities who recently acquired Gigamon—"an investment hedge fund that at the time was based in New York" and "investment authority whose name is redacted"—forced this suit to extract money from Apcon.  Trial Tr., at 163:23–164:1, 170:10–22.  Apcon claimed that Gigamon had "change[d] its story" regarding infringement because these mysterious financial companies had acquired Gigamon.  *Id.*  That charge infected the trial:

> And it wasn't until years later when Gigamon was purchased by an investment hedge fund that at the time was based in New York that it filed this lawsuit and for the first time said that Apcon is infringing.
>
> . . .
>
> And so the question is: Why did Gigamon change its story? Well, shortly before Gigamon filed this lawsuit, it was acquired. It was acquired by two entities, one, a company called Elliott, and the other, an investment authority whose name is redacted. Who is Elliott? Elliott is an investment hedge fund. It does not make network products. In fact, it doesn't make products at all. As the evidence will show, Elliott is in the business of buying companies to make profits from them. So that's what happened here. Elliott bought Gigamon. And what happened next? Gigamon filed this Lawsuit.

Trial Tr., at 163:23–164:1, 170:10–22.  Apcon raised this improper, prejudicial argument during its Opening Statement even though it agreed not to do so.

Apcon's original demonstratives for its Opening Statement (exchanged on April 15, 2021) expressly highlighted that Elliott managed a $34 billion investment fund:



Apcon's Original Demonstratives, at DDX-1.14 (attached as Exhibit H).

Gigamon objected to this slide because it was prejudicial, irrelevant, violated an agreed *in limine* Order, and conflicted with the Court's admonitions at the Pretrial Conference.  *See, e.g.*, Dkt. 254, at 3 (agreed motion *in limine* excluding, in part, any testimony, "evidence, argument, or reference to . . . any Gigamon stakeholder as an 'activist.'"); 02/22/21 Pretrial Conference Tr., at 162:19–22 ("Why is the timing of Gigamon's belief that Apcon's infringing its patents relevant to any issue that's going to be tried in this case?  The tortious interference is out.") (attached as Exhibit B); *id.* at 162:24–163:5 (questioning, because the trial only had infringement, validity, and damages issues, "[w]hy is it so critical and why is it relevant to impart to the jury when the Plaintiff became convinced that the Defendant was infringing its patents and was thus motivated to file the lawsuit?").

Apcon agreed in the meet-and-confer process to remove the reference to the $34 billion hedge fund.  It claimed it would only reference the fact that Gigamon was acquired in 2017, reflected in Apcon's revised Opening Statement slide:



Apcon's Revised Demonstratives, at DDX-1.14 (Dkt. 287-3).

But Apcon's Opening Statement was an about-face.  It raised the very issue that it had assured Gigamon that it would not bring up: that Elliott, a New York-based "hedge fund," acquired Gigamon to improperly extract money from Apcon through this case.  Trial Tr., at 163:23–164:1, 170:10–22.  Apcon referred to an "investment authority whose name is redacted," *id.*, contrary to the Court's instructions to the jury to "disregard the redacted portions" of documents and "not focus on those or try to speculate what has been blacked out or redacted," *id.* at 132:14–21.

Cognizant that disrupting a party's Opening Statement is a serious matter, Gigamon raised the issue as soon as reasonably practicable to fully address the question before proceedings

continued before the jury.  Indeed, Gigamon raised the issue over the ensuing weekend and before the jury heard evidence.  Dkt. 287.[20]

Then, during the first day of evidence, Apcon re-raised this issue during the cross-examination of Gigamon's CEO: "Now, a company called Elliott Management acquired Gigamon, along with an investment authority, in December of 2017[.]"  Trial Tr., at 299:21–23.   Gigamon immediately objected to the question, and the Court instructed that references to Elliott as a "hedge fund" were "prejudicial and not relevant," that the whole line of questioning was not relevant and potentially confusing the jury, and that Apcon should not continue to revisit the topic:

> Mr. De Vries, I'll allow you to ask the question about Elliott, but you're not to refer to them as a hedge fund. That's prejudicial and not relevant.
>
> But, quite honestly, pursuing this line of discussion about the ins and outs in the board room of a decision made to file this suit, I don't see that as relevant, and I think it's potentially confusing to the jury.
>
> You can ask the question that you've posed, but we're not going to revisit this topic and go into great granular detail about corporate structures or taking companies private or public. We're going to focus on your client's product and the Plaintiff's claims and is there or is there not infringement, are those claims valid or not.
>
> And we've heard a lot more about Gigamon in this case than I expected us to.  We need to get to Apcon and the products they make and are those products infringing.
>
> So I'll allow you to ask the question you've posed before the jury left the courtroom without any reference to a hedge fund, and then we're going to move on.

Trial Tr., at 305:12–306:6.  Unfortunately, Apcon's hedge-fund and "changed story" defense unfairly prejudiced Gigamon, reflected by an inconsistent verdict that went beyond the defenses

---

[20] The Court overruled Gigamon's objection during trial.  Trial Tr., at 191:8–13.  Gigamon respectfully requests that the Court find that Gigamon adequately preserved its objection to Apcon's hedge-fund reference and its "changed story" defense, especially in view of Apcon's subsequent conduct and Gigamon's contemporaneous objections.

that Apcon presented at trial.  Most notably, the jury found that Apcon did not infringe Gigamon's

patents, crediting Dr. Wicker's incorrect view of the Court's claim construction.  It then invalidated

all the asserted claims—even though Dr. Wicker himself admitted that there was no invalidity of

the '656 Patent if the jury found noninfringement:

> Q:   And under the Court's constructions, in your view, the Juniper reference does not have network ports or instrument ports, true?
>
> A:   That's correct.
>
> Q:   So if the jury believes you that the Juniper reference doesn't have instrument ports and doesn't have network ports, then they shouldn't find the '656 patent invalid, correct?
>
> A.   That is correct.
>
> Q:    And that -- and the same is true for all of what you would call the non-Gigamon references, correct?
>
> A:   That is correct.

Trial Tr., at 972:15–973:19.  In these circumstances, a new trial is appropriate.  *See, e.g.*, *All

Freight Sys. v. James*, 115 F. App'x 182, 187 (5th Cir. 2004) (non-precedential) (explaining that a

new trial is warranted when comments by counsel "impair substantial rights and cast doubt on the

verdict") (citing *Bufford v. Rowan Cos.*, 994 F.2d 155, 157 (5th Cir. 1993)); *Wilson v. Johns-

Manville Sales Corp.*, 810 F.2d 1358, 1362 (5th Cir. 1987) (explaining that comments by counsel

warrant a new trial when they "gravely impair the calm and dispassionate consideration of the case

by the jury") (quoting *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 585 (5th Cir.1985)).

## V.    CONCLUSION

For the reasons set forth above, Gigamon respectfully requests that the Court grant the

relief requested in this Motion.

Dated: May 24, 2021

Respectfully submitted,

By: /s/ *William E. Davis, III*
William E. Davis, III
(TX Bar No. 24047416)
Christian J. Hurt
(TX Bar No. 24059987)

**DAVIS FIRM P.C.**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Telephone: (903) 230-9090
Facsimile: (903) 230-9661
bdavis@davisfirm.com
churt@davisfirm.com

Jonas R. McDavit (*pro hac vice*)
Steven M. Balcof (*pro hac vice*)
Elizabeth Weyl (*pro hac vice*)
Francesco D. Silletta (*pro hac vice*)
Amy I. Wann (*pro hac vice*)
**DESMARAIS LLP**
230 Park Avenue
New York, NY 10169
Telephone: (212) 351-3400
Facsimile: (212) 351-3401
Email:  jmcdavit@desmaraisllp.com
Email:  sbalcof@desmaraisllp.com
Email:  eweyl@desmaraisllp.com
Email:  fsilletta@desmaraisllp.com
Email:  awann@desmaraisllp.com

Emily H. Chen (CA 302966)
**DESMARAIS LLP**
101 California Street
San Francisco, CA 94111
Telephone: (415) 573-1806
Facsimile: (415) 573-1901
echen@desmaraisllp.com

***Counsel for Plaintiff Gigamon Inc.***

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on May 24, 2021.


/s/ *William E. Davis, III*
William E. Davis, III